Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Attorney For Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| BRANDY ROBERTS and TONEY ROBERTS, individually, and BRANDY ROBERTS, as the Personal Representative of the Estate of Englyn Roberts,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK, INC.; and BYTEDANCE, INC.,<br><br>Defendants. | CIVIL ACTION NO.<br><br><br>COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP<br><br><br><br>JURY DEMAND |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiffs Brandy Roberts and Toney Roberts, individually, and Brandy Roberts, as the Personal Representative of the Estate of Englyn Roberts, brings this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as Instagram ("Instagram"), Snap, Inc., doing business as Snapchat ("Snapchat"), TikTok, Inc. and ByteDance, Inc. (collectively, "TikTok") and alleges as follows:

## I.    INTRODUCTION

### A.    Plaintiffs' Claims

1.      This product liability action seeks to hold Defendants' products responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically, for injuries they caused Englyn Roberts beginning in 2017, when Englyn was only 11-years-old, and her resulting wrongful death.

2.      Injuries Englyn suffered, proximately caused by Defendants' unreasonably dangerous and defective social media products, include but are not limited to, addiction, anxiety, depression, self-harm, suicidal ideation, and ultimately death. On August 29, 2020, after struggling with the harmful effects of Defendants' social media products, 14-year-old Englyn tried to take her own life. On September 9, 2020, Englyn died with her parents and family beside her.

3.      Defendants' social media products likewise caused foreseeable harms to Plaintiffs Brandy and Toney Roberts. Brandy and Toney Roberts did not consent to Defendants distributing or otherwise providing their child with access to harmful social media products and were emotionally and financially harmed by Defendants' addictive design and distribution and provision of harmful social media products to their minor child.

4.      Each of Defendants' products contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

5.      These social media products create a "perfect storm" of addiction, social

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

comparison, and/or exposure to incredibly harmful content and harmful product features. Defendants program and operate their algorithms and social media products more generally in a manner that prioritizes engagement and profits over user safety. This includes designing and distributing inherently dangerous products that appeal to kids, and operating algorithms and other technologies in a manner that promotes and amplifies harmful content.

6.     Defendants also advertise their products in misleading ways, assuring parents and the public that their products are safe and fun and that they utilize their technologies to ensure a safe and age-appropriate experience. Nothing could be further from the truth.

7.     Plaintiffs suffered several emotional, physical, and financial harms as a result—all of which are a symptom of the current health crisis among American youth and, by natural and foreseeable extension, American families, caused by certain, harmful social media products such as the ones at issue in this case.

**B.     Defendants Know or Should Know of the Harm Their Products Cause**

8.     In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). While the Facebook Papers originate from Meta, they prove dangerous designs and design defects as well as other dangers caused by the social media products of all Defendants.  Examples of the Facebook papers include and can be found at the following locations, to name only some examples:

9.     The Wall Street Journal and Digital Wellbeing published several of the Facebook Papers in November 2021,[1] including but not limited to,

a.     Social Comparison: Topics, celebrities, Like counts, selfies [Jan 2021 internal

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

document reporting findings from a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

    b.  <u>Appearance-based Social Comparison on Instagram</u> [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

    c.  <u>Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues</u> [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

    d.  <u>Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US</u> [2020 internal document reporting findings from a one-country (US) qualitative research study (n = 15 for focus groups) with young Instagram users (aged 13-21, supplemented by online diaries (n = 10) and video interviews (n = 7)].

    e.  <u>Teen Mental Health Deep Dive</u> [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

    f.  <u>Teens and Young Adults on Instagram and Facebook</u> [2021 internal document reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].,

10.    Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

    a.  Why We Build Feeds

    b.  Is Ranking Good

    c.  Big Levers Ranking Experiment

    d.  [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

    e.  MSI Metric Note Series

    f.  The Meaningful Social Interactions Metric Revisited: Part 2

    g.  The Meaningful Social Interactions Metric Revisited: Part 4

    h.  The Meaningful Social Interactions Metric Revisited: Part 5

    i.  Meaningful Social Interactions Useful Links

    j.  MSI Documentation

---

[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

k.   Evaluating MSI Metric Changes with a Comment-Level Survey

l.   Surveying The 2018 Relevance Ranking Holdout

m.  Overview of MSI + Pages and Survey Research

n.   Is Multi-Group Picker "Spammy?"

o.   Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

p.   [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

q.   Planned MSI Metric Changes in 2020

r.   MSI Metric Changes for 2020 H1

s.   Should We Reduce the MSI Weight of Sticker Comments?

t.   Max Reshare Depth Experiment

u.   "Understand This Post's Ranking" —How I Miss Thee!

v.   Facebook and Responsibility

w.   The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x.   One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y.   News Feed UXR Quarterly Insights Roundup

z.   What Happens If We Delete Ranked Feed?

aa. News Feed Research: Looking Back on H2 2020

bb. Content from "Political" Pages in In-Feed Recommendations

cc. Political Content in In-Feed Recommendations (IFR)

dd. In-Feed Recommendations HPM —April 15 2021

11.     These documents are all incorporated by reference into this Complaint and the sole reason they are not attached is length and file size. However, the contents of these documents and other Facebook Papers are material to Plaintiffs' claims.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

12.     On information and belief, all Defendants have some degree of knowledge about the harms their products cause users, particularly teen, child, and other vulnerable user populations, and all Defendants continue to design, market, sell and operate those products in a harmful and dangerous manner anyway and in the interest of competing with one another and increasing already astronomical profits. Meta is simply the only one whose documents have been disclosed; even then, only a small fraction of relevant Meta documents has been disclosed. Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what these social media designers and distributors have done in the name of corporate greed.

13.     All Defendants have actual knowledge that children under the age of 13 are using their social media products; that Defendants' social media products are highly addictive and harmful to a significant population of all users, but especially teens, children, and certain protected classes (women, people of color, and low socioeconomic status ("SES")); that certain design features that serve no functional, informational, societal, or educational purpose (for example, "likes" and "streaks") are causing harm to users; and that algorithms and algorithm-driven product features are dangerous and harmful by design and as designed. Defendants knew about these harms, could have made their products safer at minimal cost and expense, and opted to stay the course instead and to increase user engagement and already astronomical revenue.

14.     Despite knowledge of the dangerous and harmful characteristics of their products, Defendants have made and continue to make calculated cost-benefit business decisions and are consistently prioritizing their already astronomical profits over human life.

C.     **The Social Media Epidemic Among Children**

15.     On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased

a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Defendants.

16.    The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit,

    a.    The Instagram product which launched in 2010 and was acquired by Facebook (now Meta) in 2012, and which is designed and distributed by Meta.

    b.    The Snapchat product which launched in 2011, and which is designed and distributed by Snap, Inc.

    c.    The TikTok product which launched in 2016, and which is designed and distributed by TikTok.

17.    By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly." Moreover, there are an estimated 24.5 million teen internet users in the U.S. alone. What this means for each of these defendants is more than 15 million U.S. teens (aged 13 to 17) using their social media product on a regular basis.

18.    Teens make up a significant percentage of all social media users and, in the United States, they also represent Defendants' only significant opportunity for growth due to saturation of the adult market. Defendants see them as a gateway for other potential users, that is, they use U.S. teens to recruit parents and adult relatives as well as younger siblings – including pre-teen siblings Defendants are not permitted provide accounts to but to whom Defendants do provide accounts, by simply refusing to verify age and identification on the

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

front end and by turning a blind eye to public comments, posted videos, and other instances where these underage users openly announce that they are underage. On information and belief, U.S. teens also are the most lucrative for Defendants when it comes to advertising revenue as well. While all reasons for this are not yet known, it is known that teens spend more time on average than other users and, further, Defendants report exponentially higher revenue per user in connection with United States users on an annual basis.

**D.    Disparities Between Public Statements and Harm to Children**

19.    Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Defendants have spent years publicly denying these findings—while internally confirming them.

20.    Defendants have denied for years that their products are harmful or addictive while, in fact, Defendants' products *are* harmful and addictive, facts that the social media industry has been aware of for years. Defendants knew the truth and chose to conceal it and not disclose to the public or parents of young users, as Defendants knew that such disclosure would prevent them from further growth and development of these products and product features.

21.    In Meta's case, for example only, the Facebook Papers include years' worth of studies and reports discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and SSI. This includes research confirming that higher engagement (*i.e.* more sessions and/or time spent over a certain threshold) causes higher negative effect for users, and other

hallmarks of addiction (referred to by Meta as "problematic use"). In late 2019, Meta conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram."[3] The resulting Power Point found that use of Defendants' social media products made certain social comparison-based harms worse for a significant percentage of teen girls. *See id.* at p. 29 (referring to its own product mechanics as "addicting" and noting that TikTok users often spend more than four hours on TikTok every day).[4]

22. Moreover, the type of harms described in the Facebook Papers relate to specific product mechanisms and product features. Defendants have designed each of their products to contain unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users and their families.

23. Defendants know exactly the harms that their products are causing yet remain focused on maintaining and increasing user engagement which translates into greater profits for Defendants. On information and belief, there have been studies dating back almost a decade on related topics, which studies are not known or, in some cases, even made available to the general public; but Defendants knew or should have known about these studies as, often times, they related to the products being designed and developed by Defendants and Defendants' scientists and/or engineers.[5]

24. Defendants also know that their recommendations and other product features, that is, features whereby Defendants promote and/or send content to users and otherwise try to connect users who, in fact, are often complete strangers, result in disproportionate harms to vulnerable users including children, teens, teen girls, and women. Yet Defendants continue to reap astronomical profits at the expense of these users.

---

[3] *See* https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf
[4] *Id.*
[5] *See, e.g.*, Sept. 30, 2021, Senate Hearing Transcript, at 1:07:47 (reference to study published in National Academy of Sciences "way back in 2014.").

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

25.     For example, each of these Defendants has a "friend" and/or "follow" recommendation feature in their social media product. This refers to a feature whereby Defendants recommend to users other users they may "want" to friend or follow, with the intent that these users will then connect via a friend request mechanism, direct messaging, and similar product features meant to increase engagement among users. These recommendation systems serve the singular purpose of making more money for Defendants in that they are meant to keep users engaged through connections, which connections are suggested, prompted, and encouraged by Defendants. But also, which connections involve complete strangers and where Defendants' own recommendation systems frequently make and perpetuate harmful recommendations.

26.     In terms of harms to young girls,

    a.   3.5% of teen girls on Instagram say the platform makes thoughts of "Suicide and Self Injury" worse.

    b.   17% of teen girl Instagram users say the platform makes "Eating Issues" (e.g. anorexia and bulimia) worse;

    c.   "We make body image issues worse for 1 in 3 teen girls."

*See* "Mental Health Findings," *supra*.

27.     Plaintiffs do not yet have access to internal documents for all defendants, but those are not needed to infer that these defendants employ similar–equally harmful–social media features. Meta research concludes that Meta is not the only one causing harm to teens and children. *See, supra,* "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US" (March 2020) ("Instagram is seen as having the highest impact, although TikTok and Snapchat aren't far behind").

28.     On information and belief, all Defendants are aware of algorithmic bias and know or should know that each of their products are defective in this regard.

29.     Specifically, Defendants' algorithm products also suffer from algorithmic bias, including as it relates to race. Algorithmic bias in these social media products is a a

dangerous, even deadly, issue for protected classes – and one that warranted immediate disclosure once identified. Upon information and belief, Meta, Snap, and TikTok's social media products also are directing and promoting harmful and violent content in greater numbers to African American users and did direct and promote harmful and violent content in greater numbers to Englyn Roberts than what they promoted and amplified to other, Caucasian users of similar age, gender, and state of residence – which harmful and violent content directly contributed to Englyn Roberts' addiction to Defendants' social media products and resulting death.

30.     On information and belief, all Defendants are aware of algorithmic discrimination and know or should know that their products are defective in this regard.

31.     Defendants also know that their products are contributing to teen depression, anxiety, suicidal ideation, self-harm, and even suicide. Why don't they change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Defendants' top priority is growth and competition concerns, and Defendants see "acquiring and retaining" teens as essential to their survival. As Defendants know, teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns linked to addiction), represent Defendants' greatest (if not only) growth opportunity in the US, and can be used by Defendants to recruit older and younger family members and friends.

32.     In TikTok's case, TikTok internal documents show that children 14 and under comprise half—if not more—of TikTok's entire U.S. user base.[6]

33.     Meta, Snap, and TikTok also know that they cannot expect significant growth in the U.S. beyond the estimated four million teens that begin using the internet each year.

34.     Meta, Snap, and TikTok also believe that teens are the best way to capture household adults and children. Pre-teens look to their older siblings in terms of which social

---

[6] Raymond Zhong & Sheera Frenkel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times, Aug. 14, 2020, *available at* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html

media products to use and how to use them, and often obtain guidance from them to open their first account, while parents and grandparents are influenced by teen household members and open accounts to participate in their child's life.

35.     Meta, Snap, and TikTok likewise know that children under 13 are using their products, and see these children as a tappable and valuable market, which they must capture and use to increase revenue and ensure competitive positioning in the long-term; *see also* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html    (insiders report knowledge of underage users posting and TikTok's failure to act).

36.     Defendants go so far as to study brain and identify vulnerabilities and other areas where they can adjust their products and approach to appeal more to the teen demographic. For example, in December of 2021, Insider reported on an internal Meta document titled "The Power of Identities: Why Teens and Young Adults Choose Instagram." It is clear from this document that Meta, and its competitors, are marketing to children and teens – including in ways meant to exploit the differences between teens and adults.

37.     Identified among Meta's internal documents are other product features that cause harm to teen users, which product features are relatively standard among Defendants' products. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms, which Meta considered hiding for the benefit of its users (referred to as "Project Daisy") but ultimately did not.[7]

38.     Another example is Direct Message feature possessed by Defendants' social media products, and lack of restrictions when it comes to teens and children. Defendants' products do something no other product does: they encourage children and teens to use their product, then they make those children and teens accessible to strangers (for example, by permitting public profiles and/or viewing of content posted by these children and teens), then they provide predators with a direct means of communication (Direct Messaging features) that is both unfettered and, according to Defendants, unmonitored. In fact, Defendants

---

[7] *See* https://www.nytimes.com/2020/01/17/business/instagram-likes.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

monitor and/or have the technology needed to detect critical harm areas, such as sexual exploitation, bullying, and even underage use.

39.     On information and belief, Defendants are incredibly guarded when it comes to the types of data they collect, to the point where they will not even disclose certain, critical information to parents and/or police and other law enforcement upon request.

40.     In the case of Defendant Snap, its product is even more harmful in this regard *because* of its disappearing design. The Snap product is designed in a manner that encourages and enables such abuse, which dangerous and defective design serves Snap's economic interests by increasing its user base. For example, one common pattern among predators–which Defendants know or should know about–is to find children and teens on Instagram and encourage them to open or move the discussion to Snapchat, as it is generally understood that it is easier to get away with child exploitation and abuse through Snap's disappearing message feature.

41.     At the same time, Defendant Snap's disappearing design and marketing of that feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos.

42.     Defendants are aware of the harms resulting from certain of their product designs and features and are aware of product changes that would make their social media products safer for young users, and that would have made them safer for Englyn Roberts. Defendants' routinely refuse and/or disregard such safety measures, however, in the name of corporate profit and engagement. Defendants are unwilling to risk losing popularity and engagement among teen users, even if it means causing affirmative (sometimes fatal) harm to other teens and children as a result.

43.     One example includes access features each defendant has and makes available even in the case of minors. For example, instant messaging where defendants not only proactively recommend connecting with certain users, but then knowingly provide adult users and other strangers with unfettered access to children and teens.

44.     Defendants know that teens are more vulnerable and suffer harms from use of their social media products at higher rates than adult users. Defendants also know that teens access social media longer and more often than adults.

45.     Advertisers are willing to pay a premium for unfettered access to child and teens users so Meta, Snap, and Tiktok, in turn, work hard to make their social media products as appealing and addictive to children and teens as possible, even though it knows that they are harmful to children and teens.

**E.     Defendants' Focus on Profits Over Safety**

46.     Defendants know the harmful impact their social media products have. Instead of warning users and/or re-designing their products to make them safer, however, Defendants choose enhancing profits over protecting human life.

47.     Indeed, the problematic use identified in medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

48.     Defendant Meta slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users. Defendant Meta also knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens, and Meta leadership ultimately rejected recommendations to launch Project Daisy due to the risk of engagement decrease, advertising revenue loss, and similar economic reasons. Meta has repeatedly refused to protect its users from harm for fear of offending other users, decreasing teen engagement, and/or losing revenue from its advertisers as a result.

49.     Defendant Snap has designed product features that serve no utility but that help children and predators hide harmful content from parents and authorities, and that promote illegal and dangerous behavior. It's failure to enforce its one account rule further promotes and amplifies bullying and other unwanted interactions, making it impossible for

victims to escape the ill effects of the Snap product. Defendant Snap also has implemented inherently addictive and dangerous product features, such as Snap Streaks and various trophies and unknown rewards systems, meant to hook teens at any cost. Likewise, it has implemented various inherently dangerous features, non-communication features over the years, such as Snap Cash and Snap Maps.

50.     Defendant TikTok has designed and implemented inherently addictive product features, as well as technologies that go above and beyond standard algorithms utilized by many of its competitors. It knows or has reason to know (a) when underage children are utilizing its social media product, (b) that its product exposes children to unwanted interactions through direct messaging features, and (c) that features of its product addict children to its product

51.     Ultimately, Defendants all have control over their technology and product design and how it is used and implemented. In all cases, Defendants can monitor and protect children, but in every case, Defendants have chosen instead to make their products more popular and more accessible – at the cost of the health and wellbeing of their young users. In other words, Defendants know that their products are harmful and dangerous, could make them less harmful and less dangerous, but opt instead for attracting and retaining new users (valuing profits ahead of safety).

52.     Meta, Snap, and TikTok all represent to users and parents that they utilize technologies to keep users safe and Meta Snap, and TikTok have all developed and implemented such technologies to a limited degree. These technologies do not require content moderation, but rather, function automatically and as part of the product itself. Moreover, such identification is only made necessary *because* of the content Defendants' themselves are recommending. For example, if Defendants utilized their technologies – as they have told users they do and will – they would be able to stop themselves from identifying and directing young users to some of the most violent, harmful, and disturbing content.

53.     Defendants are perfectly capable of enforcing their own Terms of Service,

Community Standards, and other guidelines, with minimal cost. They can adjust controls in a manner that would better protect their users, especially children and teens, from certain, significant harms caused by Defendants' product features, user setting options, recommendations, and algorithmic-driven product features. Yet, Defendants repeatedly ignore these issues, choosing profits over human life. That is not a choice Defendants have the right to make.

54. On information and belief, Defendants Meta, Snap, and TikTok do not employ adequate safety controls in the development of their social media products and product features and, once invested in and/or launched, do not address safety issues as those become known.

55. This is the business model utilized by all Defendants – engagement and growth over user safety – as evidenced by the inherently dangerous design and operation of their social media products. At any point any of these Defendants could have come forward and shared this information with the public, but they knew that doing so would have given their competitors an advantage and/or would have meant wholesale changes to their products and trajectory. Defendants chose to continue causing harm and concealed the truth instead.

**F. Overview of Claims**

56. Plaintiffs bring claims of strict liability based upon Defendants' defective design of their social media products that render such products not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of such products with a negligible increase in production cost.

57. What's the world has learned from the Facebook Papers is that Meta and its competitors in the social media space *could* provide social media products that do not promote or amplify harmful content to teens and children – these companies simply choose to not do so as that would mean not relying on harmful algorithms and fewer billions of

dollars in revenue.

58.    Plaintiffs also bring claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of these products and their harmful algorithms are unknown to minor users and their parents.

59.    Finally, Plaintiffs also bring claims for common law negligence arising from Defendants' unreasonably dangerous Instagram social media products and their failure to warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms. Defendants also failed to warn minor users and their parents of foreseeable dangers arising out of use of their social media products.

60.    Defendants' own former and/or current developers often do not allow their own children and teenagers to use these social media products.[8] For many years, Defendants have had actual knowledge that their social media products are dangerous and harmful to children but have actively concealed these facts from the public and government regulators and failed to warn parents about these known harms for continued economic gain.

61.    Plaintiffs' claims do not arise from third party content, but rather, Defendants' product features and designs, including but not limited to algorithms and other product features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity, direct harmful content in great concentrations to vulnerable user groups, put minor users in contact with dangerous adult predators, enable and encourage minors to hide harmful content from their family and

---

[8] *See, e.g.,* https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

friends, encourage and facilitate exploitation and abuse of minors through marketing, recommendation and messaging features, and data policies involving the concealment and/or destruction of information necessary to the protection of minors, and otherwise prioritize engagement (and Defendants' profits) over user safety.

## II.    PARTIES

62.    Plaintiffs Brandy and Toney Roberts are individuals residing in New Iberia, Louisiana, and Plaintiff Brandy Roberts is in the process of being appointed the administrator of the Estate of their daughter, Englyn Roberts, who died on September 9, 2020. Plaintiffs have not entered into any User Agreements or other contractual relationship with any of the Defendants herein in connection with Englyn Roberts' use of their social media products. As such, in prosecuting this action Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreements. Additionally, Plaintiffs expressly disaffirm all User Agreements with Defendants into which their daughter may have entered.

63.    Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, application that are widely available to users throughout the United States.

64.    Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States.

65.    Defendant TikTok, Inc. is a California corporation with its principal place of business in Culver City, CA. Defendant TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States.

66.    Defendant ByteDance Inc. is a Delaware corporation with its principal place

of business in Mountain View, CA. Defendant ByteDance owns and/or operates TikTok, Inc., and owns and/or operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States.

### III.    JURISDICTION AND VENUE

67.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Defendants are residents and citizens of different states.

68.    This Court has personal jurisdiction over Defendants because they are each headquartered and have their principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants Meta and Bytedance's principal places of business are in the Northern District of California and Defendants Snap, Inc. and TikTok Inc are residents of the State of California.

### IV.    DIVISIONAL ASSIGNMENT

69.    The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County, where Defendant Meta Platforms, Inc. maintain its primary place of business.

### V.    FACTUAL ALLEGATIONS

**A. Facebook and Instagram Background and Products**

70.    Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004, at which time, Facebook was nothing like the product it is today. In fact, when Facebook was first founded, only students at certain colleges and universities could use the social media product – which changed by 2006, such that anyone with an email address could now use it. Facebook became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters is in Menlo Park, California. Facebook recently changed its name to, and is referred to herein and collectively with

Instagram, as Meta.

71.     Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

72.     Meta's recommendation-based feeds and product features promote harmful content. Meta's algorithms are programmed to prioritize number of interactions and not quality of interactions. Worded otherwise, Defendants promote and amplify content based on engagement objectives and not the health and well-being of their users, which renders their social media products inherently dangerous and defective, particularly when used by teens and children.

73.     Both the Facebook and Instagram products show users a "feed." A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

74.     Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

75.     In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee

tested and confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

> "Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."
>
> Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."
>
> The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.
>
> In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.
>
> According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.
>
> Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.
>
> "We will correct that," he said.

*See* https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli. Meta has had almost a decade to fix these product defects but has not – instead, its products have severely harmed millions of teens in the U.S. alone.

76. The Instagram product also has a search feature called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. This is not content the user has searched for our requested. Instead, it is content Meta selects via its algorithms

(which Meta in turn programs to increase engagement and in other ways Meta knows to be harmful to users, but more profitable to Meta, as well as paid advertisements created with Meta's assistance or approval, and the like.

77.     Meta designs and operates its Explore product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the purpose of ensuring continued growth, engagement, and revenue increase.

78.     The Instagram product also has features known as "Reels" and "Stories, which promote the use of short videos and temporary posts, respectively. These products were developed to appeal to teens and Meta knows that these products are addictive, as well as defective.

79.     Meta prioritizes and promotes harmful content through these product features.

80.     The promotion of harmful content has become so central to Defendants' business models that Defendants regularly opt to conceal the truth and continue harming users instead of making their products safer and less harmful.

81.     Worded otherwise, it is not any single or even multiple pieces of body-focused or celebrity content harming young Instagram users, but rather, the formatting and presentation utilized by Meta in its effort to increase engagement and growth at any cost. For example, no single celebrity post is problematic, but instead, the harm arises from seeing countless pieces of content and Meta's amplifying effect. For example, Meta uses artistic content from celebrities like Cardi B, an artist young girls look up to and admire, and uses that content as bait in a manner it has internally identified as harmful to a significant percentage of its young, female users. It is not the content itself which is harmful. In fact, the content in its originally intended form is not harmful at all. Instead, it is a combination of Meta's product design, algorithmic identification and promotion system, targeting tools, and the sheer volume of body-focused imagery Meta pushes on its youngest users without their

knowledge or consent (much less the knowledge of consent of their parents or the artists providing this material) that is harming these young users. And Meta knows it.

82. Meta also pushes these content types or themes to young girls in exponentially higher numbers despite knowledge of the resulting harm to a significant percentage of those same young, female users.

83. Instagram profile and privacy settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. At all times relevant, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users. But even now, when Instagram claims that it is defaulting certain categories of users into private profiles, all a user need do is change the profile setting and, once again, Instagram will allow all users to message and send follow requests to underage users. Meta can protect users from this specific harm, can do so immediately, and chooses to not do so as a matter of engagement and growth.

84. Permitting public profiles for underage users serves no critical purpose in terms of product functionality but, instead, it increases user engagement during onboarding (when a user first starts using a social media product) by increasing user connections and generally by providing all users with greater access to other users, in this case, irrespective of their age. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Defendants are aware of these harms and have opted to not make necessary and cost-effective changes to prevent it.

85. Defendant Meta's Direct Message settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide strangers (good or bad) with direct and unsupervised access to children and teens. Again,

however, Meta opts for engagement over safety.

86.     Meta's allowance of multiple accounts, refusal to verify age, identity, even authenticity of email addresses further exacerbates the harms by making it impossible to avoid unwanted interactions. Other users can literally open accounts as fast as those accounts can be blocked and, when coupled with the excessive and addictive usage habits Meta promotes among teens, these features create a perfect storm for depression, anxiety, and Suicide and Self-Harm.

87.     Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its social media products. In the case of Instagram, Defendant Meta collects individualized data – not just about the user, but also about the user's friends and contacts – and then selects content and notification frequency for its users and notifies them via text and email. Meta's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing.

88.     Instagram also incorporates several product features that serve no functionality purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters). The harm from these product features does not relate to a single "like" or filter, or any specific series of content or potential content.  Rather, it is the product itself. Meta knows that these product features disproportionally harm teen girls and young women.[9]

89.     Instagram also creates images and GIFs for users to post on their videos and

---

[9] *See, e.g.*, the documents disclosed at https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Appearance-based-Social-Comparison-on-Instagram-.pdf, *supra*.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

90.     Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following,[10]

> To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

91.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion,

---

[10] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

- **We do not claim ownership of your content, but you grant us a license to use it.** Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

92.    Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

93.    Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

94.    Meta's products are used by many millions of children every day.

**B.    Snapchat Background**

95.    Snapchat was founded in 2011, by three Stanford college students, and quickly became a wildly popular social media product among U.S. teens. It is one of the most widely used social media products in the world and is used by more than 69% of all U.S. teens (age 13 to 17).[11] Snap's headquarters is in Santa Monica, California.

96.    Snapchat started as a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product became well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. However, the Snapchat social

---

[11] *See* https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/

media product quickly evolved from there, as its leadership made design changes and rapidly developed new product features intended to and that did increase Snapchat's popularity among teen users.

97.     In 2012, Snap added video capabilities to its Snapchat product, pushing the number of "snaps" to 50 million per day; in 2013, "Stories" and "Chat" features; in 2014, live video chat capabilities, "Our Story," Geofilters and Community Geofilters, and Snapcash.

98.     By 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company records. In other words, like Meta, Snap decided to monetize its userbase and, from that point forward, began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors.

99.     By 2015, Snapchat had over 75 million monthly active users and was the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform. Snap currently estimates having between 92.8 and 96.6 million users in the United States, with at least 17 to 17.7 million of those being children under the age of 18. Against this backdrop, Snap advertises and promotes its product as safe and fun—which could not be further from the truth.

100.     Snap uses an algorithm or similar technology to suggest connections, that is, Snap sends messages to users based on some secret formula Snap uses to determine whether someone should "friend" someone else. This is known as "Quick Add," and these Snap-initiated messages result in exposure to harmful contacts, bullying, and dangerous predators. This feature contributes nothing to the product itself and serves no informational or communication purpose. Similar to Meta's product, this product is designed to reinforce addiction and increase the odds of maintaining more users for longer.

101.     Snapchat users also have an "Explore" feed that displays content created by other users around the world. These product features are designed to grab and keep users'

attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

102.    As with Defendant Meta, Snap's algorithms and/or similar technologies determine the content that gets recommended and/or populates its user experience on the Snapchat social media product. This includes content sent directly from Snap to its users, for Snap's own purposes, and prior to any sort of user search or request for such content. And as with Defendant Meta, Snap knows or should know that its algorithms are promoting and amplifying harmful content to children and teens and are operating with a degree of algorithmic discrimination that is particularly harmful to Snap's most vulnerable user groups.

103.    Snapchat offers several unique messaging and data features. It is perhaps most famous for its self-destructing content design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous product feature because it both encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with a safe and efficient vehicle to recruit victims. Snapchat is a go-to application for sexual predators because of this product feature.[12]

104.    For years Snap has received reports of child abuse and bullying occurring through its product and because of its product features,[13] yet has kept those features in place as removing them would result in considerable impact on the popularity of Snap's social media product.

105.    Harmful and dangerous interactions likewise occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to children and teens.

106.    But also, this is a dangerous product feature because it does not operate as

---

[12] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/
[13] *See, e.g.*, https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a (Snapchat Has Become A 'Haven for Child Abuse' With Its 'Self-Destructing Messages').

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

advertised. Snap's disappearing design and marketing of this feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos – and are often bullied, exploited, and/or sexually abused as a direct result. These are harms known to Snap.

107.    In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. As with Meta's algorithms, Snap's technology promotes and amplifies harmful content as a means of increasing user engagement and growth opportunities. Snap has actual knowledge of the harm it is causing its users, and consistently prioritizes its own profits regardless.

108.    Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors. This is an inherently dangerous product feature, which serves no practical purpose – but that does provide strangers and predators with access to the location of minor victims. This product feature has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these are harms known to Snap.

109.    But also, Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a significant number of minor users of Snapchat are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2). Snap *could* protect its minor users, but in many instances, does not.

110.    Snap also has a "My Eyes Only" product, which many parents do not know about – including Plaintiffs in this case. Snap's My Eyes Only Product encourages and enables young users to hide harmful content from parents by allowing them to hide content in a special tab that requires a passcode, and where content cannot be recovered – even by Snap itself – without the correct passcode. The content self-destructs if a user attempts to

access the hidden folder with the wrong code. My Eyes Only has no practical purpose or use, other than to hide potentially harmful content from parents and/or legal owners of the devices used to access Snap. Moreover, while this information and evidence should be in Snap's possession and control, it has designed thus product in a way that causes the permanent loss of relevant and often incredibly material and incriminating evidence in the event of products liability lawsuit, like this one.

111.    On information and belief, Snap's disappearing messages are defective for this reason as well. Snap has possession, custody, or control of that data, knows that it will be relevant and material in the event of products liability litigation, but has designed its technologies – *i.e.* its advertised "disappearing" functionality which suggests that Snap itself no longer has access to such data – in a manner that frustrates and actively prevents parents from monitoring the activity of their underage children on Snap's social media product. These are serious defects, which Snap should be required to remedy immediately.

112.    Like Meta, Snap also sends push notifications and emails to encourage addictive behavior and to increase use of its Snapchat product. Snap's communications are triggered and based upon information Snap collects from and about its users, and Snap "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Snapchat and view the content Snapchat selected, increasing sessions, and resulting in greater profits to Snap. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

113.    The Snapchat social media product also features a series of rewards including trophies, streaks, and other signals of social recognition like the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Moreover, these features serve no communication or informational purposes. They are designed to be addictive, and to encourage greater use of the Snap product without regard to any other content or third-party communication. But also, they have been

repeatedly recognized by organizations and even government agencies around the world as being among the most addictive products when it comes to teen social media users.

114.     These product features serve no purpose other than creating dependencies on Snap's product by children and teens, which dependencies in turn cause sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious harms to mental and physical health.

115.     Snapchat incorporates several other product features that serve no functionality purpose, but that do make Snap's product more appealing to children and teens (*i.e.*, avatars, emojis, and games) while simultaneously using known mechanisms to addict those same children and teens (*i.e.* streaks and trophies offering unknown rewards). These features and the ones discussed above were particularly addictive to Enlgyn Roberts, and were targeted to underage users like Englyn Roberts.

116.     The Snap Streak feature is unique to Snap's product and is one of the most – if not the most – addictive products available "especially to teenagers."[14] *See also* FBD 37/21, "Teen Meaningful Interactions and Feed post Feedback – Focus Groups" (May 2018), at p. 5 ("Streaks are a very important way for teens to stay connected. They are usually with your closest friends and they are addictive.") Snap knows that its Snap Streak product is addictive and has known for years but continues to provide that product to teens and children.

117.     These are just some examples of Snapchat's harmful product features.

118.     Snap has also developed images for users to decorate the pictures or videos they post, and Snap has developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

119.     These images, Lenses, and licensed audio and video content supplied and

---

[14]*See* https://abcnews.go.com/Lifestyle/experts-warn-parents-snapchat-hook-teens-streaks/story?id=48778296

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

120.    Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. Snap's current Terms of Service grant Snap several, sweeping sets of legal rights, from licensing to ownership, as follows (and for example only as there are several provisions in Snap's Terms of Service that address legal rights over user content, comments, and other usage and activities),

## 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

For all content you submit to the Services, you grant Snap and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute that content. This license is for the purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones. This license includes a right for us to make your content available to, and pass these rights along to, service providers with whom we have contractual relationships related to the provision of the Services, solely for the purpose of providing such Services.

121.    Snap directly profits from the videos and pictures and other content its users create in collaboration with Snap, as described above.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

122.    Snap knows that it is harming teens yet consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

**C.    TikTok Background**

123.    TikTok is a video sharing social media application where users create, share, and view short video clips. Known in China as Douyin, TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to ten minutes. TikTok is the international version of Douyin, which was originally released in the Chinese market in September 2016. In 2017, TikTok was launched for iOS and Android in most markets outside of mainland China; however, it became available worldwide only after merging with another Chinese social media service, Musical.ly, on August 2, 2018.

124.    TikTok has been downloaded more than 130 times in the U.S. and it was ranked by Cloudflare as the most popular website of 2021. "TikTok was the world's most-visited website in 2021, overtaking YouTube in US watch time and Facebook in app downloads for the first time."[15]

125.    Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by an algorithm developed by TikTok to show content on the "for you" based upon the user's demographics, likes, and prior activity on the app.

126.    TikTok is like Meta and Snap in that it has designed its algorithms to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to user's viewing habits and interests.

127.    There are four main goals for TikTok's algorithm: which the company translates as "user value," "long-term user value," "creator value," and "platform value."

---

[15] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer To US Lawmakers' China Fears*, Buzzfeed, Mar. 10, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-project-texas-bytedance-user-data

128.   An internal TikTok document was leaked, which document is titled "TikTok Algo 101." This document was created by TikTok's engineering team in Beijing and offers details about both the app's mathematical core and insight into the company's understanding of human nature. The document explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention" — that is, whether a user comes back — and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments and playtime, as well as an indication that the video has been played.

129.   A recent Wall Street Journal report revealed how TikTok relies heavily on how much time users spend watching each video to steer them toward more videos that will keep them scrolling, and that process can sometimes lead young viewers down dangerous rabbit holes, and toward content that promotes suicide or self-harm.

130.   Another article, by the New York Times, explained how TikTok markets itself as an "artificial intelligence company." "The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.' It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch … Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok."[16]

131.   TikTok's algorithm also, often works in concert with Meta's. For example, a teen may first learn about a harmful topic through Meta's algorithm, which potential harm is

---

[16] John Herrman, *How TikTok is Rewriting the World*, N.Y. Times, Mar. 10, 2019, *available at* https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

then identified by TikTok's algorithm, based on any number of unknown factors, and the TikTok product will amplify and promote that same harm through a virtual series of how-to videos. These are inherently dangerous and harmful product features, particularly when aimed at children.

132.    TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

133.    TikTok's app and algorithm have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation, thus financially benefitting Defendants. At the same time TikTok "challenges" involve users filming themselves engaging in behavior that mimics and often times "one-ups" other users posting videos performing the same or similar conduct, and these TikTok "challenges" routinely involve dangerous or risky conduct.

134.    TikTok's algorithm presents these often-dangerous "challenges" to users on their FYP and encourages users to create, share, and participate in the "challenge."

135.    Moreover, TikTok's algorithm products suffer from serious algorithmic bias, including as it relates to race and low SES. Upon information and belief, TikTok is aware of these harms, including the fact that its algorithm pushes higher volumes of violent and dangerous content to members of protected classes. This is harmful content these users, including and specifically Englyn Roberts, would not have seen but for TikTok's product design and programming.

136.    Upon information and belief, the TikTok product is causing harms to protected classes based on their protected status, including the promotion and amplification of harmful and violent content in greater numbers to African American users, like Englyn Roberts. Upon information and belief, TikTok's social media product did direct and promote

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

harmful and violent content in greater numbers to Englyn Roberts than what they promoted and amplified to other, Caucasian users of similar age, gender, and state of residence – which harmful and violent content directly contributed to Englyn Roberts' addiction to its social media product and resulting death.

137.    These are just some examples of how TikTok operates its product to generate profit, at the expense of the health and well-being of its users, particularly its child and teen users.

138.    Until mid 2021, TikTok also and by default made all users profiles "public," meaning that strangers, often adults, could view and message underage users of the TikTok app. This also meant that those strangers could then contact children directly, as happened in this case.

139.    TikTok has also developed artificial intelligence technology that detects adult users of TikTok who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes TikTok with actual knowledge that a significant number of minor users of TikTok are solicited to send and actually do send sexually explicit photos and videos of themselves to adult users in exchange for consideration in violation of 18 U.S.C. § 1591(a)(1)–(2). Yet, like Snap and Meta, TikTok uses this technology selectively and only when it is to the benefit of TikTok, enabling harms through its social media products in the interest of engagement.

140.    Like Meta and Snap, TikTok also sends push notifications and emails to encourage addictive behavior and to increase use of their TikTok product and sent such notices to Englyn Roberts. TikTok's communications are triggered and based upon information TikTok collects from and about its users, and TikTok "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open TikTok and view the content TikTok selected, increasing sessions, and resulting in greater profits to TikTok. Even the format of these notifications has been designed to pull users back on to the social media

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

platform—irrespective of a user's health or wellbeing.

141.     TikTok markets itself as a family friendly social media application, and markets to children and teens.

142.     TikTok exclusively controls and operates the TikTok platform for profit, which like Instagram and Snapchat, creates advertising revenue through maximizing the amount of time users spend on their platforms. Accordingly, while TikTok purports to have a minimum age requirement of 13-years-old, it does little to verify user age or enforce its age limitations despite knowledge that underage use is widespread.

143.     In fact, underage TikTok users will often post videos of themselves in which they clearly are not old enough to be using the TikTok social media product. On information and belief, TikTok's sophisticated algorithms can identify when a user has crooked teeth or a crack in their bedroom wall, so there is little question that those same algorithms can identify underage children in posted videos. But also, TikTok has actual knowledge of underage users. For example, in July 2020, TikTok reported that more than a third of its 49 million daily users in the United States were 14 years old or younger. And while some of those users were 13 or 14, at least one former employee reported that TikTok had actual knowledge of children even younger based on videos posted on the TikTok platform – yet failed to promptly take down those videos or close those accounts.[17] In fact, TikTok regularly knows or should know of underage users with accounts and who post videos on its platform, whether because of its algorithms, viewing by TikTok employees, and/or flagging by other TikTok users. In many such instances, TikTok not suspend the account, require age verification, or notify the underage user's parents of such prohibited use.

144.     TikTok does not seek parental consent for underage users or provide warnings or adequate controls that would allow parents to monitor and limit the use of TikTok by their children. TikTok does not verify user age, enabling and encouraging teens and children to

---

[17] Raymond Zhong & Sheera Frenkel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times, Aug. 14, 2020, *available at* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

open TikTok accounts, providing any age they want, and without parental knowledge or consent. TikTok does not include the deliberately addictive design of its product, which is addictive and did addict Englyn Roberts, to the point where she hid from her parents her usage of the TikTok social media product.

145.    Further, based on TikTok data leaked to the New York Times, internal TikTok documents show that the number of daily U.S. users in July of 2020 estimated by TikTok to be 14 or young—18 million—was almost as large as the number of over-14 users, around 20 million. While the rest of TikTok's U.S. users were classified as being "of unknown age."[18]

146.    TikTok also does not rely on users' self-reported age to categorize them, and knows when it has underage users engaged in harmful activities on its platform. Like Meta, TikTok has algorithms through which is creates estimated or approximate age for its users, including facial recognition algorithms that scrutinize profile pictures and videos, as well as other methods through which it can estimate age with reasonable certainty. TikTok knows that users under the age of 13 are using its social media product, including to post videos of themselves, which videos are public by default and result in harm to these underage users.[19]

147.    Like Meta and Snap, TikTok has tried to boost engagement and keep young users hooked to its social media product by any means necessary.

148.    TikTok has developed images and memes to enact images for users to decorate the videos they post. TikTok has also developed memes and other images for users to apply to images they post on TikTok. TikTok also has acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. When users incorporate images, memes and music supplied by TikTok into their postings, TikTok becomes a co-publisher of such content. A TikTok user who incorporates images, memes and musical content supplied by TikTok into their posts is functionally equivalent to a

---

[18] Id.
[19] Id.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

novelist who incorporates illustrations into her story. TikTok can no longer characterize the images, memes, and musical content it supplies to its users as third-party content as the novelist can disclaim responsibility for illustrations contained in her book.

149.    And like Snap and Meta, TikTok contracts for legal rights to this third-party content, such that it is not "third-party content" at all. TikTok's current Terms of Service grant TikTok sweeping sets of rights as follows, and for example only,

> You or the owner of your User Content still own the copyright in User Content sent to us, but by submitting User Content via the Services, you hereby grant us an unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide licence to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and/or distribute and to authorise other users of the Services and other third-parties to view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit your User Content in any format and on any platform, either now known or hereinafter invented.

150.    TikTok directly profits from the videos and pictures and other content its users create in collaboration with TikTok, as described above.

151.    TikTok knows that it is harming teens yet consistently opts for prioritization of profit over health and well-being of its teen users— the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

**D.    Defendants' Applications Are Products**

152.    There is no dispute that the above-described social media products are designed and manufactured by Defendants, and further, Defendants refer to them as such.

153.    These products are designed to be used by minors and are actively marketed to teens *and tweens* across the United States and were marketed to Englyn Roberts.

154.    Defendants' user terms and federal law prohibit use of these social media products by any person under the age of 13. Regardless, Defendants know that children under 13 are using their products, and actively study and market to that population.

155.    Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own

marketing efforts and design, and through their approval and permission to advertisers who create and target ads to young users. Meta documents establish that Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance. But also, Meta documents establish that it is not the only one, and that other social media companies, including Meta's co-defendants in this case, invest heavily to appeal to teens and underage users. *See, e.g.*, https://www.businessinsider.com/leaked-docs-facebook-papers-instagram-competition-tiktok-youtube-snapchat-2021-12?op=1#whats-so-great-about-tiktok-one-slide-said-2 (quoting from Facebook Papers that address the reasons why teens love Snapchat and TikTok),



COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP





REDACTED for CONGRESS

156. Defendants also are aware that large numbers of children under the age of 18 use its product without parental consent. At least in the case of TikTok and Snap, parental consent is required for use of their social media products and based on their own user terms. Yet all Defendants design their social media products in a manner intended to allow and not

prevent such use, including failure to verify age and identification and allowing and encouraging multiple accounts.

157.    Defendants have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase their own profits.

**E.    Defendants' Business Model is Based on Maximizing User Screen Time and Defendants Know That their Products are Addictive**

158.    Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

159.    The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

160.    Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users. The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

161.    This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system

designed by Snapchat. The system is designed to reward increasingly extreme behavior because users are not actually aware of what action will unlock the next award.

162.    Instagram, like Snapchat and TikTok, is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds. This design proximately caused Englyn Roberts' death.

163.    According to industry insiders, Defendants have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

164.    Defendants do not warn users of the addictive design of their product. On the contrary, Defendants actively try to conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

165.    Defendants have repeatedly represented to the public and governments around the world that their products are safe and not addictive. Even now, TikTok represents in its community guidelines that its priority is "safety, diversity, inclusion, and authenticity."[20] Snaps Terms of Service claim "We try hard to keep our Services a safe place for all users."[21]

166.    Again, the amount of revenue Defendants receive is based upon the amount

[20] https://www.tiktok.com/community-guidelines?lang=en
[21] See Snap, Inc. Terms of Service, ¶ 9.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

of time and user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Defendants opted for user engagement over the truth and user safety.

167.    Defendants' social media products are built around a series of design features that do not add to the communication and communication utility of the applications, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" and "streaks" and "trophies"). This design is unreasonably dangerous to the mental well-being of underage users' developing minds, and these social media companies know it.

168.    Defendants know that their products are addictive, and that millions of teen users want to stop using them but cannot.

169.    Defendants engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

170.    Defendants spend billions of dollars marketing their products to minors, and have deliberately traded in user harm for the sake of their already astronomical revenue stream.

**F.    Defendants Have Designed Complex Algorithms to Addict Teen Users and Their Business Models Are Based on Maximizing User Screen Time**

171.    Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to three of the largest technology companies in the world.

172.    Defendants' algorithms select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. Defendants'

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its algorithms promote.

173. Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

174. One of these features—present in Snapchat, Instagram, and TikTok—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never-ending "feed." Defendants know that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

175. Defendants' algorithm-controlled features are designed to promote content likely to increase user engagement, which often means content Defendants know to be harmful. This is content that users might otherwise never see but for Defendants' sorting, prioritizing, and/or affirmative pushing of such content to their accounts.

176. In the words of one, high-level departing Meta employee,

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[22]

---

[22] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

177.    The addictive nature of Defendants' products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

178.    Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

179.    Defendants also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

180.    Defendants' algorithms adapt to promote whatever content will trigger minor users' engagement and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate, or prioritize between particular content based on whether it is helpful or harmful to the psychic well-being of their minor users. Once a minor user engages with abusive, harmful, or destructive content, Defendants' algorithms will direct the minor user to content that is progressively more abusive, harmful, and destructive to maximize the user's screen time.

181.    Defendants' algorithms are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. Defendants' algorithms do not function like traditional search engines that select particular content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. Defendants' algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Defendants' algorithms use to select content therefore encompasses far more information than voluntarily furnished by the particular user and include private information about the user that Defendants discover through undisclosed surveillance of their behavior both online and offline.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

182.    These addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Defendants have addicted their users and are then able to influence user preferences, their algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Defendants' algorithm design will promote elephant content to User One and moonbeam content to User Two. These types of algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as long as those promotions increaser user engagement.

**B. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

183.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

184.    The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

185.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways

connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

186.   In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

187.   The algorithms in Defendants' social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

**G.     Defendants Misrepresent the Addictive Design and Effects of Their Social Media Product**

188.    During the relevant time period, Defendants stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

189.    During the relevant time period, Defendants advertised via commercials and/or third parties that their products were fun and safe to use, and that Defendants employed their technologies to ensure safe and age-appropriate experiences. Defendants knew or should have known that those statements were untrue.

190.    Neither Meta, TikTok, or Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

**H.     Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

191.    Plaintiffs seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiffs' claims arise from Defendants' status as designers and marketers of dangerously defective social media product, as well as Defendants' own statements and actions, not as the speaker or publisher of third-party content.

192.    Defendants' have designed their products to be addictive. For example, Defendants have developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Defendants even calculate the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Defendants' social media products, which also—as Defendants know—are the times that

their health and well-being necessitate them not being on Defendants' social media product. Defendants' products are designed to and do addict users on a content neutral basis.

193.    The structure of these social media products and the technologies Defendants' design and utilize are, standing alone, harmful to users and irrespective of content. For example, a primary purpose of Defendants' algorithm designs is to determine individual user preferences first so that Defendants can then influence user behavior and choices second— which is particularly dangerous in the case of teens.

194.    In the case of Meta, for example, Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users. Defendants Snap and TikTok likewise seek to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

195.    On a content neutral basis, the manipulation and control these Defendants knowingly wield over their users daily is profoundly dangerous.

196.    Defendants are responsible for these harms. These harms are caused by Defendants' designs and design-decisions, and not any single incident of third-party content.

197.    Yet Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media products. These dangers are unknown to ordinary consumers but are known to Defendants. Moreover, these dangers do not arise from third-party content contained on Defendants' social media platforms. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Defendants,

    a.  Design and constantly re-design their social media products to attract and addict teens and children, their "priority" user group.

    b.  Design and continue to operate their social media products to ensure that teens and children can obtain unfettered access, even over parental objection.

    c.  Know when teens and children are opening multiple accounts and when they

are accessing their products excessively and in the middle of the night.

d.   Work with advertisers and influencers to create and approve harmful content and provide direct access to teens and children – a user population Defendants know to be vulnerable.

e.   Operate and provide the above social media products with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features and approving product programming that promotes harmful content over clear dangers to user safety.

198.   While it may be a third party creates a particular piece of harmful content, the teens and children harmed by Defendants' social media products are not being harmed by a single piece of harmful content. They are being harmed by Defendants' products, programming, and decisions to expose teens and children to harmful product features and to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

199.   Englyn Roberts and children like her do not open social media accounts in the hopes of become addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Defendants' products, losing control, becoming irritable and depressed when access is denied, and hyper-vigilance to avoid detection. These and other behaviors can and do result in serious harm to Defendants' minor users and resulted in serious harm to Englyn Roberts and her parents.

200.   Englyn Roberts and children like her do not start using social media in the hopes of being exposed to product features that cause harm to them. Yet the use of Instagram, Snapchat, and TikTok involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms at least some of these Defendants acknowledge in internal documents. Defendants' products caused these harms to Englyn Roberts and her parents.

201.   The harms at issue in this case do not relate to or arise from third party content, but rather, Defendants' product features and designs, including algorithms and other technology that (a) addicts minor users to their products; (b) amplify and promote harmful social comparison through product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators and otherwise expose to them to seemingly unstoppable unwanted interactions from persons not on their friend list or equivalent. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

202.   Defendants' products are addictive on a content neutral basis. Defendants design and operate their social media products in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content, as well as mechanisms and features meant to release dopamine. Defendants deliberately addict teen users and the harms resulting from these addictions are foreseeable, even known, to Defendants.

203.   Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' product. This includes but is not limited to Defendants' wholesale failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts, in the case of Meta) meant to ensure easy access by children and teens, irrespective of parental consent. Likewise, Defendants—even those who claim to permit only one account—know that teen users are opening multiple accounts and fail to prevent such abuses.

204.   Defendants also promote, encourage, and/or otherwise contribute to the development of harmful content. This Complaint has quoted from just a few of the thousands of Meta documents disclosed by the Facebook whistleblower, which establish this, and

Plaintiffs anticipate finding the same types of evidence in discovery with TikTok and Snap. One of biggest hurdles to discovery of these claims and the harms Defendants have caused is that none of these defendants have ever been willingly transparent or cooperate regarding disclosure of their product designs and operations. In this manner too these defendants have actively concealed such harms.

205.    Defendants also approve ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021 regarding Meta,[23]

> **Senator Mike Lee: (01:21:34)**
> Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.
>
> **Senator Mike Lee: (01:22:31)**
> I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find their partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

---

[23]   https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript ("October 5, 2021, Senate Hearing Transcript").

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

206.    In other words, Defendant Meta approves advertisements "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment from the advertisers. On information and belief, Snapchat and TikTok do as well.

207.    Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Again, Defendants specifically select and push this harmful content, for which they are then paid, and do so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's how [Defendants] can push teens into darker and darker places."[24] Defendants know that their products can push children "all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[25] Defendants know that their products the content they are encouraging and helping to create is harmful to young users and choose "profits over safety"[26] any way.

208.    None of Plaintiffs' claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold these Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any good faith attempts on the part of these Defendants to restrict access to objectionable content.

209.    Plaintiffs is not alleging that Defendants are liable for what the third parties said, but for what Defendants did.

210.    None of Plaintiffs' Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill

---

[24] *Id*.
[25] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.
[26] *Id*. at 02:47:07.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

their legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include,

    a.  Not using their addictive and inherently dangerous algorithm and similar technologies in connection with any account held by a user under the age of 18.

    b.  Not permitting any targeted advertisements to any user under the age of 18.

    c.  Prioritizing internally their removal of harmful content (content their systems are promoting and amplifying) over the risk of losing some user engagement.

    d.  Requiring identification upon opening of a new account, requiring parental consent for users under the age of 18 (which Snap and Tiktok currently claim to do but do not actually enforce in any way), and restricting users under the age of 18 to a single account.

    e.  Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access these social media products and does not stop bad actors.

    f.  Immediate suspension of accounts where Defendants have reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments or chats and/or messages with any third party and where Defendants can determine an "estimated" age of under 13 based on other information they collect and/or have in their possession (including, for example, posted videos that clearly feature children under 13); and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

    g.  Suspension of accounts and, in some cases, user bans, where Defendants have reason to know that the user is over the age of 18, but where they are providing

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

information to suggest that they are minors and/or are representing themselves as minors to other users; and not allowing the account to resume until the user provides proof of age and identity.

h.  Removing social comparison features and/or hiding those features to reduce their harmful impact on teen users.

i.  Instituting advertising safeguards to ensure that Defendants are not profiting directly from or otherwise pushing or endorsing harmful advertising content, and removing advertising targeting tools so that advertisers cannot harm vulnerable user groups by aiming harmful advertisements at them.

j.  Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

k.  Removing all friend and group and content recommendation systems that involve teen users in any way (so, not recommending to teen users, but also, not recommending teen users to adults) and not permitting direct messaging, snaps, or other forms of direct communication with any user under the age of 18 not already hon the other user's friend list.

211.   These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Defendants know that they can make these change and, in many cases, have discussed these or similar changes internally. However, they have not instituted these types of safety features because they know that doing so would impact their astronomical revenue.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### I.      Englyn Roberts' Death was Proximately Caused by Defendants' Social Media Products



212.    Englyn Roberts was born on July 21, 2006, and grew up in New Iberia, Louisiana. She was the youngest of eight children.

213.    Englyn was a bubbly teenager. She loved spending time with family, eating at different restaurants, and travelling to different places. She enjoyed dancing, with hip hop and lyrical dance being her favorites, and had dreams of going to college and becoming a choreographer with her own dance studio someday.

214.    Englyn enjoyed getting together on weekends and cooking outside in the backyard. She would play her music loudly and sing and dance to entertain the family. She was the baby of the family, the center of attention, and the heart.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP



215.    When Englyn was eleven years old, she was given her first cell phone and, shortly thereafter, she downloaded Defendants' social media products without her parents' knowledge or consent. Her parents provided her with the cell phone so that she would have internet access, could take photos, and could stay in touch with family and friends. Not for social media.

216.    Her parents required the access code to Englyn's phone and said that anytime Englyn changed that code she needed to provide them with the new one, which she did.

217.    What Plaintiffs did not know is that Defendants make sure that underage children can access their social media products, including by marketing to children, failing to verify age or identity (even when the children openly admitted to being underage on their public profile and/or in posts and comments which), and permitting opening of multiple accounts. It was understood among children that Meta wouldn't close your account for being under 13. You just had to say you were 13 when opening an account and could then tell people your real age. In fact, this is something many kids still do. It also was understood among children that Meta did not object to kids using more than one account, which made it

easier to hide more personal content and the existence of secondary accounts from parents and family—often referred to as a SPAM account or, in Instagram's case, a FINSTA (short for "fake Instagram").

218.    Defendants designed Instagram, TikTok, and Snapchat to frustrate and prevent parents like Brandy and Toney Roberts from exercising their rights and duties as parents to monitor and limit their child's use of their social media products. Plaintiffs were not aware when Englyn's social media usage started, nor did they ultimately know which products she used or how many accounts she opened without their knowledge or consent.

219.    Englyn's social media use coincided with a gradual decline in her mental health. Englyn became addicted to Defendants' products and spent increasing amounts of time communicating on social media, and engaged in the video, games, and reward features of Defendants' social media products.

220.    Shortly after Englyn got her phone, her mother realized that Englyn was staying up at night on her cell phone. Her parents thought she was watching videos on the internet and chatting with friends, as they still did not know about Englyn's social media use. Englyn had always been a well-behaved child, so her parents trusted her to use the phone responsibly. When they realized she was staying up on the phone, however, they instituted a 10:00 p.m. rule for all devices: Englyn's phone had to be turned off by 10:00 p.m. each night.

221.    Englyn agreed and told her parents that she would make sure her phone was off by 10:00 p.m. Unfortunately, she was already addicted to Defendants' social media products by that point – which addiction her parents had no knowledge of – and which caused her to break the 10:00 p.m. rule to use social media. One night, Englyn's mother couldn't sleep and caught her awake with the cell phone on in her room. Brandy and Toney Roberts now believe that Englyn had been regularly staying awake and was suffering from sleep deprivation due to her use of Defendants' social media products, and Defendants' failure to verify age and identity. Indeed, Defendants should not have been providing Englyn with access to their social media products at all as she was under the age of 13, which Defendants

knew or should have known based on her photos and other information in Defendants' possession, custody, and control.

222.    Regardless, from that point forward Brandy Roberts took Englyn's phone downstairs with her each night when she went to bed. Englyn then started waiting until Brandy or both of her parents were asleep and would retrieve the phone so that she could use social media throughout the night. She was always careful to replace the phone before Brandy woke up in the morning, and never got caught.

223.    Occasionally, Brandy Roberts would restrict Englyn's cell phone access, though usually not for more than a few hours or a day. Nonetheless, these efforts at exercising Plaintiff's parental rights and authority caused severe reactions in Englyn. Because of Englyn's social media addiction, she would panic without her cell phone and beg to get it back. She would tell her parents that they could do anything, except take her cell phone away. She would promise to do her chores, bring up her grades, or anything else that might get her the cell phone back – she said that she could not live without it. During these times when Englyn did not have social media access she would get anxious and depressed and would cry and sleep until she got her cell phone back. Once she had her phone back, everything seemed fine again.

224.    Englyn's parents did not learn about her social media accounts and usage until more than a year after she got her phone.

225.     The family was on vacation and Englyn could not go anywhere without her phone. Her parents told her that she needed to leave for several hours, while the family went out and so that they could spend time together and without electronic devices, and Englyn became anxious and stressed. She panicked. She said that she could not go out without her phone because she would lose her "streaks," and she needed to always have it with her. That is how Plaintiffs learned about Englyn's Instagram and Snapchat accounts.

226.    Englyn's parents were not familiar with these social media products but had seen Snapchat commercials on TV and on their own phones and understood from those

commercials that Snapchat was a product used a lot by kids to send disappearing photos to friends. Based on Snapchat's advertisements, Brandy and Toney Roberts understood and reasonably believed that Snapchat was a product marketed to kids, and that it was a fun and safe photo sharing application. Their understanding of Instagram based on marketing and available information was that Instagram was also something widely used by kids, and to keep in touch with one another. They had some knowledge of Facebook, which was used to keep in touch with friends and family and understood that Instagram was basically a Facebook type product but marketed and used by kids more than adults.

227.    They did not learn about Englyn's TikTok account until later.

228.    What her parents also did not know at that time was that, as a proximate result of her use of Instagram, Snapchat, and TikTok, specifically due to the intentionally addictive nature of these products as well as the harmful content they were promoting and amplifying to Englyn via various algorithmically drive product features and harmful social comparison features, Englyn Roberts had begun to suffer from depression, anxiety, self-harm, and suicidal ideation.

229.    On the outside, Englyn appeared to still be a happy child. She began having a few small issues at school and, of course, missed her friends when COVID started in early 2020. But otherwise, she continued to enjoy family parties on the weekend, and continued to entertain her loved ones with singing and dancing every chance she got.

230.    On August 28, 2020 – one day before Englyn tried to take her life – she was goofing around with her mom. She took and sent a photo of herself with her favorite teddy,



Then she found her mom napping, so took and sent a photo of her mom with her favorite teddy too,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP



231.    Plaintiffs had no way of knowing what Defendants' social media products were doing to their precious child while, in sharp contrast, Meta, Snap, and TikTok knew or should have known that they were causing this harm to Englyn, including based on her age, usage information, and usage patterns—which each of these defendants collects and, on information and belief, closely tracks—and content to which each of these defendants were repeatedly exposing her via unsolicited methods, such as push notifications and algorithmically driven recommendation systems.

232.    Defendants provided eleven-year-old Englyn with access to multiple accounts on Defendants' social media platforms without her parents' knowledge or consent.

233.    Defendants knew or should have known that Englyn was under the age of 13 and obtained (multiple) social media accounts yet failed to restrict her access or notify her parents of her account status.

234.    Defendants promoted and amplified harmful content, resulting in self-harm, suicidal ideation, and, eventually, death.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

235.    But for Meta, Snap, and TikTok's failure to conduct a reasonable age verification, Englyn Roberts would not have been exposed to the harmful features and design of their respective social media products.

236.    But for certain product features (to name only a few examples, Instagram and TikTok's "like" features and Snapchat's "Snap Streak" feature), Englyn Roberts would not have experienced the anxiety and depression that stem from harmful social comparison designs.

237.    But for the algorithmic discrimination contained in all three of the social media products at issue, including recommendation systems as well as content promotion and display systems, Englyn Roberts would not have been targeted and overwhelmed by disproportionately violent, sexual, and other harmful content.

238.    But for the recommendation, public profile, and direct messaging settings designed, implemented, and utilized by all three of the social media products at issue, Englyn Roberts would not have suffered exploitation and bullying by strangers utilizing Defendants' platforms for that purpose and in a foreseeably damaging manner – that is, the degree of harm caused by certain events is amplified exponentially by Defendants' products designs, additive characteristics, and available or default settings.

239.    But for the endless feed and explore features characteristic of all three of the social media products at issue, Englyn Roberts would not have experienced the harmful dependencies that these features were designed to promote.

240.    In 2019, Englyn was photographed at a family event using the Instagram social media product,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   241.   What no one knew at that time was that, while Englyn appeared to be doing

16   fine to her parents and family, in fact, she was being bombarded by Instagram, Snapchat, and

17   TikTok with harmful images and videos (ranging from harmful social comparison content to

18   violent and disturbing content glorifying self-harm and suicide). She was also receiving

19   sexual and exploitative direct messages from strangers, which are allowed and enabled by

20   all three of the social media products at issue, along with Defendants' harmful connection

21   and content recommendations – all of which would eventually kill her.

22   242.   These social media companies were not providing fun and safe photo sharing

23   services, but rather, were dealing in incredibly addictive product features and pushing

24   harmful algorithmically driven content, intended to keep Englyn hooked on their products

25   by any means necessary.

26   243.   Meta, Snap, and TikTok's social media products also made harmful

27   recommendations to and about Englyn Roberts, connecting her with strangers to increase

28

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

their own engagement and thereby their own profits, which recommendations had nothing to do with any communication or informational aspects of Defendants' products.

244.    Meta, Snap, and TikTok's social media products also provided other users with unfettered access to Englyn through public profiles and features (in the case of Meta and TikTok), recommendation systems (in the case of Meta, Snap, and TikTok), and features that provided direct messaging access to Englyn regardless of her minor status, regardless of whether other users were on her "friends" list or equivalent, and regardless of duration, time of day, or frequency (Meta, Snap, and TikTok).

245.    In 2018 and 2019, Englyn began interacting with and then sharing content about depression, suicidal ideation, and self-harm via Defendants' social media apps, unbeknownst to her parents and teachers. Defendants not only had knowledge as to what was happening, but in many cases, were the ones recommending the harmful content.

246.    Meta, Snap, and TikTok also utilized algorithms and/or similar technologies to steer Englyn towards and otherwise promote and amplify harmful and unsolicited content. Defendants are not only aware of their promotion and amplification of harmful content but knew or should have known that the harms caused by their marketing and amplification systems would be exacerbated by Englyn's sleep deprivation. On information and belief, all three of these defendants collect and track usage information and know when teens and children are using their products, know when they are using them at night, and know when such use is harmful.

247.    Defendants' algorithms and similar technologies are designed to exploit these social media caused vulnerabilities. The more addicted and sleep deprived a user becomes, the more Defendants' systems promote and amplify harmful content and the more push notifications Defendants' systems send.

248.    In September 2019, Englyn and her friend began exchanging links to incredibly harmful and violent page and users they had found because of Instagram's algorithm and recommendation systems, which content Instagram hosted on its platform for

years while young users, like Englyn, continued sharing and viewing the incredibly harmful and violent content with alarming frequency. The content can no longer be found on Instagram, as Meta finally enforced its own Terms of Service and deleted the account in December of 2021 – but not before Meta's algorithms recommended this content to any number of children.

249.    In September of 2019, Englyn and her friend messaged each other with the harmful content recommended and/or promoted by Instagram,



COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

The posting person's username was **gasstati0nparty** though, on information and belief, this user's content is posted under more than one username. In one of the videos exchanged on September 19, 2019, the woman hung herself with an extension cord attached to a door,



This is the kind of material Instagram's algorithm was recommending to 13-year-old girls in September of 2019, and it remained in Englyn's Instagram messages until December of 2021, more than a year after Englyn's death, when Instagram finally deleted this account.

250.    The sleep deprivation caused by addiction and amplification of harmful content to which Englyn was exposed through her addiction to Defendants' social media products was a proximate cause of her depression, anxiety, self-harm, and suicidal ideation.

251.    On June 13, 2020, Englyn wrote to Instagram username **brayreggiontae_**, "right just think people be suicidal for no reason." **brayreggiontae_** replied, "And people still wouldn't understand."

252.    On July 15, 2020, Englyn wrote to Instagram username **lexy.paull**, "but if i ever hurt myself tell my parents that it wasn't there fault it's my problems with finding love."



253.    Around this same time, Englyn kept a list of mental health numbers (including a suicide hotline) in her "private story" feature on Instagram and was exchanging pictures showing self-harm with one or more of her "friends" on Instagram. Meta knew that Englyn was a minor and said and did nothing to alert her parents or teachers to what was transpiring on its platform and because of the harms caused by Defendants' social media products – harms Meta itself was already studying and knew about as being among the impacts and effects of use of the social media products at issue in this case.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

254.    July 21, 2019, Englyn and her family celebrated her 14th birthday.



The celebration started early in the day and finished with an evening game of Top Golf,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP





255.    On August 11, 2020, Englyn typed an "emotional description" relating to her social media use into her cell phone's note pad application. She wrote,

> Emotional description
>
> It's only what the media sees I show ppl what they want to see but behind the social media life nobody knows the real me and how much I struggle to make sure everyone's good even though I'm not, if it's not one thing it's the other and when things are going wrong for me I just become so suicidal and I just need that emotional support I don't want anyone feeling bad for me just to support my choices I make in life, I want somebody to help me through my mental struggle bc if no ones there who do I have?



256.    On August 15, 2020, Englyn spent the day with her parents, as she often did,



257.    On August 21, 2020, Englyn spent the day at the beach having fun,



258.    On August 22, 2020, Englyn and her parents went on an outing to enjoy nature,

259.   On August 23, 2020, Englyn and her family went out for dinner,

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

260.    On August 28, 2020, Englyn took goofy selfies for social media,



261.    On August 29, 2020, at 3:30 a.m., Englyn took an extension cord and attached it to her door – just like she has seen in the Instagram video viewed countless times by herself and other young children – and attempted to choke herself – just like she had seen in the Instagram video viewed countless times by herself and other young children.

262.    Englyn texted her boyfriend (with corrections and as taken from police report),

*I just want to die.*

*I can't satisfy anyone.*

*In the closet choking myself, wonder if I'm good enough to stay on Earth, because it's never enough, for anybody, nobody calls me, to check in on me, nobody, not even you, I have no reason but to die, call or I'm stepping off this stool, and I'll be done just like you wanted, never mind, see, take too long, dropping phone, so I won't get what you're saying, bye love you.*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

263. She then used her phone and took a video of herself crying, in which the extension cord can be seen.

264. Brandy and Toney Roberts received a text message from Englyn's boyfriend's mother at 3:30 a.m., asking them to check on Englyn. They found their daughter hanging from the extension cord moments later. Toney picked her up and laid her on the floor, and Brandy began doing CPR, which she continued until the ambulance arrived.

265. The medics were able to get a pulse, and Englyn was rushed to the hospital, where she stayed on life support for nine days.



Her parents stayed by her side every possible moment, singing to her, playing music, and holding her hand. On September 7, 2020, they made the difficult decision to take Englyn off life support and continued to stay by her side as she left them.

266. Englyn's death devastated her entire family, and her friends. She was a bright

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

light and loved by everyone who knew her, and Plaintiffs had no choice but to assume that her death was caused by some sort of mental illness no one knew about and with no outward symptoms. They became active and vocal on issues of teen mental health awareness and made a commitment to help other families and children if they could. They also tried to reach out to Englyn's friends and other children on social media through postings and messages of positivity and hope.

267.    Then, one week after the anniversary of Englyn's death—the week of September 13, 2021—Toney Roberts was watching the news and learned about the Facebook Whistleblower, Francis Haugen. He began looking for and listening to news on this topic, learning about what Instagram's leadership knew about the harms its products are causing to teen users. To name only one example, Meta recognized that a significant percent of its users are addicted to its products, that children open multiple, secret accounts (referred to by Meta as a "unique value proposition"), and that use of Instagram increases thoughts of what Meta calls "SSI" (Suicide and Self-Injury) in a percentage of teen girls who use it – Englyn was nothing more than a statistic to Defendants, and Defendants chose profits and growth over the health and well-being of unsuspecting teen users like Englyn.

268.    That was when Toney Roberts charged Englyn's old cell phone to see whether the things they were describing on TV were what happened to his daughter. He was able to access some of her social media accounts from her phone and began scouring those with the information now in his possession.

269.    What became clear in September of 2021 is that Englyn's death was the proximate result of psychic injury caused by her addictive use of Instagram, Snapchat, and TikTok.

270.    Throughout the period of Englyn's social media use, Plaintiffs were unaware of the clinically addictive and mentally harmful effects of Instagram, Snapchat, and TikTok. In fact, they were not aware that Englyn was using these products at all until more than a year after she began.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

271.    Defendants designed Instagram, TikTok, and Snapchat to frustrate and prevent parents like Brandy and Toney Roberts from exercising their rights and duties as parents to monitor and limit their child's use of their social media products.

272.    Defendants knowingly designed Instagram, TikTok, and Snapchat to enable minor users such as Englyn Roberts to use, become addicted to, and abuse their products without the knowledge and consent of their parents. In fact, Snapchat's Snap Streaks product feature has been referred to as one of the addictive across all social media platforms, particularly when it comes to teens. Snap has been urged to remove that product feature for years, for the health and safety of children, and has refused.[27]

273.    Defendants designed Instagram, TikTok, and Snapchat to be attractive nuisances to users below the age of 13 such as Englyn Roberts but failed to exercise ordinary care owed to underage business invitees to prevent the recommendation, promotion, and amplification of dangerous and harmful content.

274.    Some if not all of these Defendants possessed actual knowledge that Englyn was below the age of 13 when she began using their products, included based on content in her posts and messages with others users; that she was addicted to their products; that she was being presented with and exposed to excessive amounts of dangerous and harmful content; and that there was a likelihood that she would attempt something dangerous as a result of her use of their social media products, yet Defendants took no steps to terminate her usage, inform her parents of her unauthorized use and exposure to dangerous and harmful content, or notify law enforcement officers.

275.    Defendants not only failed to warn Brandy, Toney, and Englyn Roberts of the dangers of addiction, sleep deprivation, sexual abuse, and problematic use of their applications, but affirmatively misrepresented the safety, utility, and addictive properties of their products to minor users and their parents, including Plaintiffs and Englyn Roberts.

---

[27] *See, e.g.*, https://www.bbc.com/news/technology-47623626 (Snapchat under scrutiny from MPs over "addictive" streaks), March 19, 2019.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

## VI.    PLAINTIFF'S CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

276.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 275 as if fully stated herein.

277.    Under Restatement (Second) of Torts § 402(a) and California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

278.    Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

279.    Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

280.    Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

### A.  Inadequate Safeguards From Harmful and Exploitative Content

281.    Snapchat, TikTok, and Instagram are defectively designed.

282.    As designed, Snapchat, TikTok, and Instagram algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

283.    As designed, Snapchat, TikTok, and Instagram algorithms and other product features are not reasonably safe because they affirmatively direct and recommend minor users to harmful groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design and algorithm and technologies that do not recommend harmful groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Defendants know that these product features cause a significant number of harms to their minor users, such as sexual exploitation, bullying, and encouragement of self-harm and suicide – all of which are at issue in this case.

284.    Defendants also engage in conduct, outside of the algorithms and related technologies themselves, that is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including teens like Englyn Roberts; and product design features intended to attract and engage minor users to

these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

285. Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users.

**B.  Failure to Verify Minor Users' Age and Identity**

286. Snapchat, Tiktok, and Instagram are defectively designed.

287. As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

288. Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

289. Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

290. Likewise, minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these

tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

291.     Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only can estimate the age of their users, but they do.

292.     The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.     Inadequate Parental Control and Monitoring**

293.     Snapchat, Tiktok, and Instagram are defectively designed.

294.     Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

295.     It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

296.     Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

297.     Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.     Intentional Direction of Minor Users to Harmful and Exploitative Content**

298.     Snapchat, Tiktok, and Instagram are defectively designed.

299.     Default "recommendations" communicated to new teenage users, including

Englyn Roberts, purposefully steered her toward content Defendants knew to be harmful to children of her age and gender.

300.  Ad content pushed to new minor users, including Englyn Roberts, because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender. This defect is only worsened by the algorithmic discrimination that exists in Defendants' products, and operated to the detriment of Englyn Roberts.

**E.    Inadequate Protection of Minors from Sexual Exploitation and Abuse**

301.  Snapchat, Tiktok, and Instagram are defectively designed.

302.  Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images, report sex offenders to law enforcement, or allow users' parents to readily report abusive users to law enforcement.

303.  Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

304.  Minor users of Defendants' products lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material.

305.  Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass-messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

**F.    Design of Addictive Social Media Products**

306.  Snapchat, Tiktok, and Instagram are defectively designed.

307.  As designed, Defendants' social media products are addictive to minor users

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use the social media products at issue, not for enjoyment, but simply to feel normal. Once they stop using these products, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

308.    Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

309.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

310.     Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is.  Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

311.     The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction.  Originally designed for Facebook, BFAS has since been generalized to all social media.  BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

312.     BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

313.     You spend a lot of time thinking about social media or planning how to use it.

314.     You feel an urge to use social media more and more.

315.     You use social media in order to forget about personal problems.

316.     You have tried to cut down on the use of social media without success.

317.     You become restless or troubled if you are prohibited from using social media.

318.     You use social media so much that it has had a negative impact on your job/studies.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

319.   Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

320.   Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

    a.   Tolerance, the need to spend more time using social media to satisfy the urge.

    b.   Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    c.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    d.   Continuing to use social media despite problems.

    e.   Deceiving family members or others about the amount of time spent on social media.

    f.   The use of social media to relieve negative moods, such as guilt or hopelessness.

    g.   and Jeopardized school or work performance or relationships due to social media usage.

321.   Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by

maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

322. It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

**G.    Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

323. Snapchat, Tiktok, and Instagram are defectively designed.

324. Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

325. It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

326. Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

solicited by an adult user or when a user has sent inappropriate content to minor users.

327. Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

328. Moreover, it is reasonable for parents to expect that platforms such as Instagram, Snapchat, and TikTok, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

329. As a proximate result of these dangerous and defective design attributes of Defendants' product, Englyn Roberts suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until late 2021.

330. As a result of these dangerous and defective design attributes of Defendants' products, Plaintiffs Brandy and Toney Roberts have suffered emotional distress and pecuniary hardship due to their child's mental harm and death resulting from her social media addiction.

331. Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram, Snapchat, and TikTok.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

332. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 325 as if fully stated herein.

333. Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the

manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiffs' injuries.

334.    Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Instagram, Snapchat, and TikTok.

335.    Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

336.    The magnitude of harm from addiction to Defendants' product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

337.    The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Defendants had actual knowledge of such harms.

338.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

339.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

340.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

341.    As a result of Defendants' failure to warn, Englyn Roberts suffered severe mental harm, leading to physical injury from her use of Instagram, Snapchat, and TikTok.

342.    As a result of Defendants' failure to warn, Plaintiffs Brandy and Toney Roberts, have suffered emotional distress and pecuniary hardship due to their child's mental harm resulting from social media addiction.

343.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram, Snapchat, and TikTok.

### COUNT III – NEGLIGENCE

344.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 337 as if fully stated herein.

345.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such Englyn Roberts.

346.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

347.    As product manufacturers marketing and selling products to consumers, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

348.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

349.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Enlgyn Roberts, using their social media products.

350.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants know that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

351.    Defendants are negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

352.    Defendants are negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of their social media products.

353.    Defendants are negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

354.    As a result of Defendants' negligence, Englyn Roberts suffered severe mental harm from her use of Instagram, Snapchat, and TikTok.

355.    As a result of Defendants' negligence, Plaintiffs Brandy and Toney Roberts

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

have suffered emotional distress and pecuniary hardship due to their child's mental harm resulting from social media addiction.

356.    Defendants are further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including Englyn Roberts, whom they knew would be seriously harmed through the use of their social media products.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants for relief as follows:

a) Past physical and mental pain and suffering of Englyn Roberts, in an amount to be more readily ascertained at the time and place set for trial;

b) Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c) Past medical care expenses for the care and treatment of the injuries sustained by Englyn Roberts, in an amount to be more readily ascertained at the time and place set for trial;

d) Past and future impairment to capacity to perform everyday activities;

e) Plaintiffs' pecuniary loss and loss of Englyn Roberts's services, comfort, care, society, and companionship to Brandy and Toney Roberts;

f) Loss of future income and earning capacity of Englyn Roberts;

g) The $8,927.02 Plaintiffs paid to bury their 14-year-old daughter;

h) Punitive damages;

i) Injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein, remedy the unreasonably dangerous algorithms in their social media products, and provide warnings to minor users and their parents that Defendants' social media products are addictive and pose a clear and present danger to unsuspecting minors;

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

j) Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

k) Such other and further relief as this Court deems just and equitable.

Dated: July 20, 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC


By: */s/ Laura Marquez-Garrett*
Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
Matthew Bergman
matt@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

SEEGER WEISS LLP
Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

*Attorneys for Plaintiffs*

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP